United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

DRUCILLA COOPER,

　　　　　Plaintiff,

　　v.

UNITED AIR LINES, INC.,

　　　　　Defendant.

Case No.  13-cv-02870-JSC

**ORDER RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Re: Dkt. No. 73

　　　　Plaintiff Drucilla Cooper alleges that Defendant United Air Lines, Inc. ("United") (1) violated the Equal Pay Act, 29 U.S.C. § 206, et seq., by paying her less than her male counterparts, (2) demoted her from her position as a Supervisor of Security Officers at the San Francisco Airport maintenance facility in retaliation for complaints she made regarding these pay disparities, and (3) subjected her to discrimination on account of her age and disability.  Now pending before the Court is Defendant's Motion for Summary Judgment.  (Dkt. No. 73.)  Having carefully considered the parties' filings and having had the benefit of oral argument on February 26, 2015, the Court GRANTS Defendant's motion.

**SUMMARY JUDGMENT EVIDENCE**

　　　　Plaintiff was hired by United in 1997 as a security officer following her retirement from the Berkeley Police Department after 15 years of service.  In January 2002, Plaintiff was promoted to Supervisor of Security Officers.  Plaintiff was one of three supervisors for the security officers at the San Francisco Maintenance Hub, each of whom was assigned to supervise one of the three shifts.  During the time period relevant here, Plaintiff supervised the day shift, while William Knight supervised the swing shift and Alex Martin Del Campo supervised the graveyard shift.

United States District Court
Northern District of California

In the fall of 2010, United merged with Continental Airlines.  Following the merger, many departments went through a Talent Selection or TAS Process.  As a result of the TAS Process, some positions were eliminated, others were modified, and still others were largely unchanged.  According to Defendant, it was up to each department to determine how the TAS Process would be implemented.  (Dkt. No. 73-6 at ¶ 6 & Ex. 1.)  Plaintiff's department experienced the TAS Process in the summer of 2011.  The decision to institute the TAS Process was made by Darlene Marvin-Nilson who began supervising Plaintiff's department, initially on an interim basis, in the spring of 2011.  Ms. Marvin-Nilson took over the position as Senior Manager – Base Maintenance Support Services when Plaintiff's long-time supervisor Bernard Peterson retired in April 2011.  Ms. Marvin-Nilson previously held the position of Senior Manager – Base Distribution, Warehouse & Logistics, but was not selected to retain the position when that department went through the TAS Process.  When Mr. Peterson retired, she applied for and was selected as his replacement.

The same month that Mr. Peterson retired, Plaintiff filed a complaint with Human Resources Associate Sandee Singer regarding a pay disparity between Plaintiff and the two other male supervisors.  Mr. Singer forwarded the complaint to Wayne Slaughter, the then Manager of Fair Employment Practices and Diversity.  Mr. Slaughter interviewed Plaintiff in connection with her complaint and conducted an investigation of her claims in April and May 2011.  (Dkt. No. 73-15 at ¶¶ 4-5.)  It is undisputed that Plaintiff was paid less than her male counterparts.  However, as a result of his investigation, Mr. Slaughter concluded that there were legitimate business reasons for the pay differential; namely, that Employee 1 was an external hire and Employee 2 was previously in a higher paid position within United and took a pay cut when he assumed the Security Supervisor position.  (*Id*. at ¶ 4.)  Mr. Slaughter sent Plaintiff a letter to this effect closing her complaint on May 18, 2011.  (*Id*. at Ex. 1.)  Plaintiff also discussed, or at least mentioned, her concerns regarding the pay disparity to Ms. Marvin-Nilson sometime thereafter.[1]

---

[1] Ms. Marvin-Nilson testified that Plaintiff complained to her that the other supervisors were making more money than she was and her declaration similarly states that "although I do not recall the exact date, I believe Ms. Cooper mentioned this complaint to [me] sometime in late June as a point of information.  She did not ask me to take any particular action.  Nonetheless, I asked Ms.

United States District Court
Northern District of California

1  Also around this same time, Plaintiff requested an accommodation for her sleep apnea

2  disability.[2]  Plaintiff asked Ms. Marvin-Nilson about accommodating her disability by restricting

3  her working hours to daylight hours; although Plaintiff currently worked the day shift, she had

4  concerns that Defendant might begin asking supervisors to rotate shifts.  (Dkt. No. 75-4, Ex. C at

5  64:5-12; Dkt. No. 73-2, Ex. 1 at 334:23-335:7.)  Ms. Marvin-Nilson responded via an email noting

6  that Plaintiff was currently assigned the day shift and there had not yet been a decision to shift

7  schedules, but that if they decided to implement a schedule which required Plaintiff to work

8  nights, they would revisit her request for accommodation.  (Dkt. No. 73-7, Ex. 10.)

9  As part of the TAS Process, Ms. Marvin-Nilson rewrote the job description for the

10  supervisor of security officers and the position was posted on United's intranet in August 2011.

11  Ms. Marvin-Nilson met with Plaintiff, and her fellow supervisors, Mr. Knight and Mr. Martin Del

12  Campo, to inform them that the position was being posted.  Plaintiff contends that she was never

13  informed in writing that she would need to reapply for her job and that she only learned of the

14  application period from a human resources representative who called her to tell she had one day to

15  submit her application.  (Dkt. No. 75-1 ¶ 25.)  Four individuals applied for the position—the three

16  current supervisors and Russ Faultner.  Mr. Faultner was a Manager of the Base Distribution,

17  Warehouse and Logistics Department—the department previously supervised by Ms. Marvin-

18  Nilson—until he was furloughed from this position in July 2011.

19  Ms. Marvin-Nilson and Adam Calmis, a Senior Manager-Component Base Maintenance

20

21  _____

22  Cooper if Human Resources had investigated her complaint and Ms. Cooper confirmed that they
   had." (*Compare* Dkt. No. 75-4. Ex. C 15:1-4, 54:4-15 *with* Dkt. No. 73-6 at ¶ 22.)  Plaintiff
23  testified that she was not sure whether she ever raised her pay disparity claims with Ms. Marvin-
   Nilson. (Dkt. No. 73-2, Ex. A at 244:12-15 ("Q: Did you ever have any conversations with Darlene
24  about your equal pay claim, Darlene Nilsen? A: You know, I really don't know if I ever spoke to
   Darlene about my pay or not.").)

25  [2] Although Plaintiff's First Amended Complaint also includes an allegation that she suffers from
   "a knee injury which affect the major life functions of walking, running, and working," in
26  opposing summary judgment she only refers her sleep apnea. (*Compare* Dkt. No. 70 at ¶ 63 *with*
   Dkt. No. 75 at Section III.E.)  Plaintiff has thus abandoned any claim of disability discrimination
27  other than one predicated on sleep apnea.  *See Jenkins v. City of Riverside*, 398 F.3d 1093, 1095
   n.4 (9th Cir. 2005) (concluding that plaintiff had abandoned claims not raised in opposition to
28  summary judgment).

for United, conducted the interviews for the supervisor position on August 29, 2011.  Mr. Calmis did not know any of the candidates prior to the interviews.  The interviews were conducted utilizing a standard interview guide provided by United.  (Dkt. No. 73-8 at ¶ 4.)  Each applicant was asked the same predetermined set of questions and each interview lasted approximately 30 minutes.  (*Id*.)  At the conclusion of each interview, Mr. Calmis and Ms. Marvin-Nilson discussed each candidate's responses and came up with a consensus score. *(Id*. at ¶ 5.)  The scoring was performed on a scale of 1-5 with 5 being the highest.  (*Id*.)  Mr. Calmis and Ms. Marvin-Nilson "were in general agreement regarding the scores we assigned to each candidate."  (*Id*.; Dkt. No. 73-6 at ¶ 16.)  Both Mr. Calmis and Ms. Marvin-Nilson agreed that Plaintiff's performance during the interview was poor and she was given the lowest score of all four candidates—a total of 13 out of 45 possible points.  (Dkt. No. 73-8 at ¶ 6; Dkt. No. 73-6 at ¶ 17.)  The next lowest ranked candidate received a total of 22 points.  (Dkt. No. 73-6 at ¶ 17; Ex. 8.)  Plaintiff was not selected for the supervisor position.  The three supervisor positions were awarded to the two other incumbents, Mr. Knight who was 55, Mr. Martin Del Campo who was 50, and Mr. Faultner who was also 50.

Defendant notified Plaintiff that she was not selected to retain her position by letter dated September 9, 2011.  (Dkt. No. 76-1, Ex. A-1.)  The letter was titled "Reduction in Force Lay Off Notice."  Defendant contends that this is the standard letter that was provided to individuals not selected during the TAS Process.  (Dkt. No. 73-6 at ¶ 18.)  The letter stated that Plaintiff could either return to her most recent union-represented position or accept a severance package and separate from United.  Plaintiff elected to return to her position as a security officer.  This demotion resulted in a significant pay cut. Plaintiff remains employed in this position today.

**PROCEDURAL BACKGROUND**

Plaintiff filed a charge with the Equal Employment Opportunity Commission on April 16, 2012.  (Dkt. No. 70 ¶ 52.)  She was issued a Right to Sue on April 5, 2013 and filed the underlying action within 90 days.  Plaintiff filed the governing First Amended Complaint ("FAC") in November 2014 asserting four claims (1) retaliation in violation of Title VII, 42 U.S.C. § 2000e, et. seq., (2) disability discrimination in violation of the Americans with Disabilities Act ("ADA"),

United States District Court
Northern District of California

4

42 U.S.C. § 12101, et seq., (3) age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq., and (4) violation of the Equal Pay Act, 29 U.S.C. § 206. (Dkt. No. 70.)  Defendant filed the underlying motion for summary judgment following the close of fact discovery.

### LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56(a).  The Court must draw "all reasonable inferences [and] resolve all factual conflicts in favor of the non-moving party." *Murphy v. Schneider Nat'l, Inc.*, 362 F.3d 1133, 1138 (9th Cir. 2004). A fact is material if it "might affect the outcome of the suit under the governing law," and an issue is genuine if "a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  There can be "no genuine issue as to any material fact" when the moving party shows "a complete failure of proof concerning an essential element of the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

On those claims on which Defendant does not carry the ultimate burden of persuasion (the discrimination and retaliation claims), Defendant, as the moving party, has the burden of producing evidence negating an essential element of each claim on which it seeks judgment or showing that Plaintiff cannot produce evidence sufficient to satisfy her burden of proof at trial. *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000).  On the Equal Pay Act claim, on which Defendant carries the burden of proof at trial on its affirmative defense, Defendant, as the moving party, has the initial burden of producing evidence which would entitle it to a directed verdict if the evidence went uncontroverted at trial. *C.A.R. Transp. Brokerage Co., Inc. v. Darden*, 213 F.3d 474, 480 (9th Cir. 2000).

Once Defendant meets that burden, Plaintiff, as the non-moving party, must show that a material factual dispute exists. *California v. Campbell*, 138 F.3d 772, 780 (9th Cir. 1998). Allegations alone are not sufficient to meet Plaintiff's burden; instead, Plaintiff must submit admissible evidence. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001).  Plaintiff's evidence must be such that a reasonable trier of fact could return a verdict in Plaintiff's favor, *Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995), and the Court "is not

United States District Court
Northern District of California

required to comb the record to find some reason to deny a motion for summary judgment," *Forsberg v. Pac. Nw. Bell Tel. Co.*, 840 F.2d 1409, 1418 (9th Cir. 1988).

## EVIDENTIARY OBJECTIONS

As a preliminary matter, the Court addresses the parties' evidentiary objections to the extent that are relevant to resolution of the motion for summary judgment.

### A. Plaintiff's objections

First, Plaintiff objects to the Declaration of Robert F. Donohue, currently the Compensation – Manager for Defendant as hearsay, not best evidence, and lacking foundation. (Dkt. No. 73-9.)  Mr. Donohue was Defendant's Rule 30(b)(6) designee regarding the basis for the disparity in pay between Plaintiff and her male colleagues and was deposed in this capacity.  (Dkt. No. 75-4, Ex. D.)  As a Rule 30(b)(6) designee, he is not required to have personal knowledge. *See Harris v. Vector Mktg. Corp.*, 656 F. Supp. 2d 1128, 1132 (N.D. Cal. 2009) (citing 11–56 Moore's Fed. Prac.—Civ. § 56.14[1] [c] "[t]he testimony of a Rule 30(b)(6) corporate agent deponent may be presented on motion for summary judgment, even though not based on personal knowledge, because a Rule 30(b)(6) witness need not have personal knowledge of the facts to which he or she testifies."); *see also Weinstein v. District of Columbia Housing Auth.*, 931 F. Supp. 2d 178, 186 (D. D.C. 2013) (court considered declaration on motion for summary judgment, although not based on personal knowledge, because declarant was a Rule 30(b)(6) designee).

Further, Mr. Donohue's declaration indicates that he has responsibility for the design and implementation of United's compensation policies and practices, including determining the appropriate salary levels for United's management and administrative employees and the creation of salary bands or ranges.  (Dkt. No. 73-9 ¶ 2.)  He assists with the "creation and establishment of guidelines that pertain to providing salary raises (or cuts) associated with promotions and demotions within the organization, and the establishment of salary guidelines with respect to the hiring of external candidates." (*Id.*)   In light of Mr. Donohue's Rule 30(b)(6) designation and his personal knowledge, Plaintiff's objections to the declaration as lacking foundation, hearsay and violating the best evidence rule are overruled.

The Court also rejects Plaintiff's characterization of Mr. Donohue's declaration as a sham

because Mr. Donohue did not cite to any document which describes the practices to which he testified. Plaintiff does not cite any rule that a declarant can only testify as to written corporate practices.[3]

Second, Plaintiff objects to Dr. Lewin's expert report. It is unnecessary to consider Plaintiff's objections because the Court did not consider or rely on Dr. Lewin's report.

Third, Plaintiff's objection to the Declaration of Darlene Marvin-Nilson (Dkt. No. 73-6) as a sham is also overruled.[4] The sham declaration rule only applies if "the inconsistency between a party's deposition testimony and subsequent affidavit [is] clear and unambiguous." *Van Asdale v. Int'l Game Tech.*, 577 F.3d 989, 998-99 (9th Cir. 2009). Ms. Marvin-Nilson's testimony and declaration are consistent about Plaintiff having told her of her salary disparity complaints prior to the TAS Process. (*Compare* Dkt. No. 75-4 Ex. C at 54:4-15 *with* Dkt. No. 73-6 at ¶ 22.) It is Plaintiff who testified that she did not recall whether she had such a conversation with Ms. Marvin-Nilson, but then affirmed that she had done so in her declaration. (*Compare* Dkt. No. 73-2, Ex. 1 at 244:12-15 *with* Dkt No. 75-1 at ¶ 12.)

**B. Defendant's objections**

**1) Plaintiff's Request for Judicial Notice**

Defendant objects to Plaintiff's Request for Judicial Notice, which asks the Court to take judicial notice of three exhibits. (Dkt. No. 74.) First, Plaintiff seeks judicial notice of print-outs from the website for the California Bureau of Security and Investigative Services. The first print-out purports to be for Russ Faulkner and the second set purports to be exemplar printouts of individuals wholly unrelated to this action whose licenses had lapsed or expired. (Dkt. No. 74, Ex. A & B.) "Documents available through government agency websites are often considered

---

[3] Plaintiff's objection that Mr. Donohue's declaration purports to testify to the contents of computer programs is unpersuasive. Mr. Donohue identified and attached as exhibits the documents which support his testimony regarding United's compensation practices; namely, the salary bands and collective bargaining agreements. Likewise, Plaintiff's objection that Mr. Donohue's deposition testimony was "evasive and riddled with speculation" is unsupported by any line citations, and thus, unpersuasive.

[4] Confusingly, Plaintiff's objection cites to paragraph 21 of Ms. Marvin-Nilson's complaint, but that paragraph has to do with other complaints made by Plaintiff wholly unrelated to the pay disparity.

appropriate for judicial notice as documents in the public record not reasonably subject to dispute." *Musgrave v. ICC/Marie Callender's Gourmet Products Div.*, No. 14-CV-02006, 2015 WL 510919, at *3 (N.D. Cal. Feb. 5, 2015) (collecting cases re: same). Here, however, Plaintiff seeks to introduce the documents to show that Mr. Faultner lacked the necessary qualifications for the supervisor position. The documents are inadmissible for this purpose—judicial notice "is limited to the existence and authenticity of the documents rather than allowing notice of the truth of their contents." *Smith v. Nw. Tr. Servs., Inc.*, No. 13-3124, 2014 WL 2439791, at *3 (E.D. Wash. May 30, 2014). Thus, the printouts attached as Exhibits A and B may be judicially noticeable, but they are inadmissible for the purpose urged by Plaintiff. *See Galvan v. City of La Habra*, No. 12-2103, 2014 WL 1370747, at *2 (C.D. Cal. Apr. 8, 2014) ("there is a distinction between whether the Court may take judicial notice of a fact and whether that fact is admissible.")

Second, Plaintiff asks that the Court take judicial notice of documents filed in *Bonillas v. United Air Lines, Inc.*, No. 12-6574 SBA (N.D. Cal.) ("*Bonillas* documents"). A court may "take judicial notice of court filings and other matters of public record" including documents filed under seal which are "readily verifiable." *Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 (9th Cir. 2006). Defendant objects that the *Bonillas* documents lack foundation and constitute inadmissible hearsay. Plaintiff contends that the documents (1) demonstrate the "contemporaneous records that are generated as a matter of course in Talent Selection," (2) "evidence an approval process for subjecting a given position to Talent Selection," and (3) "are designed to help hiring managers determine if their position should go through the talent selection process." (Dkt. No. 75 25:28-26:7.) However, Plaintiff has laid no foundation to this effect. [5] The documents consist of an assortment of emails and a completed form entitled "Job Integration Template," but there is no accompanying declaration authenticating or laying a foundation for these documents. (Dkt. No. 74-1, Ex. C.) Accordingly, the documents are inadmissible as lacking foundation and hearsay. *See Orr v. Bank of America, NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002) ("We have repeatedly held that unauthenticated documents cannot be considered in a motion for summary judgment."); *Blair Foods, Inc. v. Ranchers Cotton Oil*, 610 F.2d 665, 667

---

[5] Notably, the *Bonillas* court refused to admit many of these documents. *Bonillas v. United Airlines*, No. 12-6574 SBA (N.D. Cal. Aug. 19, 2014) (Dkt. No. 145 at 16:9-17.)

United States District Court
Northern District of California

(9th Cir. 1980) ("hearsay evidence is inadmissible and may not be considered by this court on review of a summary judgment.")

Plaintiff's request for judicial notice is therefore denied.

### 2) Defendant's other objections

Defendant's objections that Plaintiff has in numerous places mischaracterized the record or deposition testimony are overruled as the Court is able to view the deposition testimony and other evidence and evaluate both on its own.

### DISCUSSION

Plaintiff's claims fall into two general categories.  First, her Equal Pay Act claim regarding the pay disparity between herself and her male colleagues.  Second, her claims regarding her demotion from the supervisor position in September 2011—Plaintiff contends that she was demoted in retaliation for her protected activities including complaining about the pay disparity and that the demotion was the result of age and disability discrimination.  Because the Court concludes that Plaintiff has not demonstrated that a reasonable fact finder could find in her favor on any of these claims, summary judgment must be granted in Defendant's favor.

### A.  Plaintiff's Equal Pay Act Claim

To state a prima facie case under the Equal Pay Act ("EPA"), 29 U.S.C. § 206, et seq., the plaintiff must show that employees of the opposite sex were paid different wages for equal work. *Stanley v. Univ. of S. California*, 178 F.3d 1069, 1073-74 (9th Cir. 1999).  Once plaintiff establishes a prima facie case, the burden of persuasion shifts to the defendant to show that the wage differential arose from a factor other than sex.[6]  *Kouba v. Allstate Ins. Co.*, 691 F.2d 873, 875 (9th Cir. 1982).  A defendant cannot escape liability merely by articulating a legitimate non-

---

[6] Plaintiff has cited no authority for her argument that Defendant was required to specifically plead what factor other than sex it alleged as an affirmative defense and the Court is unaware of any. "The key to determining the sufficiency of pleading an affirmative defense is whether it gives plaintiff fair notice of the defense."  *Simmons v. Navajo Cnty., Ariz.*, 609 F.3d 1011, 1023 (9th Cir. 2010) (internal citation and quotation marks omitted).  Defendant's Sixteenth Affirmative Defense –Factors Other Than Sex states that "Defendant alleges that any difference in pay between Plaintiff and her male coworkers is due to a factor other than sex."  (Dkt. No. 71 at 18.)  This is sufficient to provide Plaintiff with fair notice that under 29 U.S.C. § 206(d)(1)(iv) Defendant contends that the differential is based on a factor other than sex, as opposed to "a seniority system," "a merit system," or "a system which measures earnings by quantity or quality of production."  29 U.S.C. § 206(d)(1).

discriminatory reason for the employment action; rather, the defendant must prove that the pay differential was based on a factor other than sex. *County of Washington v. Gunther*, 452 U.S. 161, 170 (1981). In other words, the "factor other than sex" exception is an affirmative defense. *See Kouba*, 691 F.2d at 875. "The factor other than sex exception was intended by Congress to be a broad general exception... A primary purpose in adding this and other exceptions was to permit employers to utilize bona fide gender-neutral job evaluation and classification systems." *E.E.O.C. v. Maricopa County Community College District*, 736 F.2d 510, 514 (9th Cir. 1984) (internal citations and quotation marks omitted).

Defendant concedes for purposes of summary judgment that Plaintiff has made a prima facie case under the EPA. The question then is whether Defendant has met its burden of demonstrating that the pay disparity resulted from a factor other than sex, and if so, whether Plaintiff has demonstrated that Defendant's explanation is merely a pretext for discrimination. *Stanley,* 178 F.3d at 1076 ("Where the defendant demonstrates that a pay differential was based on a factor other than sex, the employee may prevail by showing that the employer's proffered nondiscriminatory reason is a 'pretext for discrimination.'). Defendant contends that the pay disparity here is the result of United's use of salary bands which assign a compensation level based upon whether a person is an internal hire, an external hire, and whether she will be supervising union members. (Dkt. No. 73-3, Ex. 5 at 49:22-50:20.) For external hires the compensation level was typically targeted around the mid-point of the range on the salary band. (*Id*. at 49:22-50:11.) For an internal hire, if the individual was being promoted from a represented (Union position) to a management position and the individual's current salary fell below the minimum of the acceptable range for the new position, the practice was either to raise the salary a fixed percentage (up to 10%) or bring it up to the minimum of the range—whichever resulted in the larger increase. (Dkt. No. 73-9 at ¶ 7.) For an internal hire from another management position, the compensation was based on the grade level of the current position and the grade level and salary range of the new position. (*Id*. at ¶¶ 16-18.) During the TAS Process, United modified its compensation practices and created a matrix to determine salary changes based on individuals moving to different positions in the company either through demotion, promotion, or lateral moves. (Dkt. No. 73-9 ¶ 22; Dkt. No. 73-3 at 56:9-25.) For purposes of the security supervisor

United States District Court
Northern District of California

10

position at issue here, these compensation practices played out as set forth below.

Plaintiff started out as a security officer at United in 1997; this was a Union position covered by the collective bargaining agreement. In 2002, she was promoted to the supervisor position at issue here. At the time of her promotion, her annual salary was $28,109.76 which was well below the salary range for the supervisor position. (Dkt. Nos. 73-9 ¶ 5; 73-11 at ¶¶ 3-4.) The salary range for the supervisor position was $42,700 to $72,500. (Dkt. No. 73-9 at ¶ 6 & Ex. 3.) Plaintiff was assigned a starting salary of $42,700 in accordance with Defendant's practice of bringing the salary up to the minimum range when an internal hire moved from a Union position to a management position. (*Id*. at ¶ 7.) From 2002 to 2011, Plaintiff received a series of merit-based pay increases plus two increases as a result of across-the-board salary increases for all management and administrative employees. (*Id*. at ¶¶ 10-11.) Her salary was also decreased on two occasions because of across-the-board pay cuts which affected all management and administrative employees following September 11, 2001 and United's bankruptcy in 2004. (*Id*. at ¶ 9.) In 2007, Plaintiff received a pay increase of 5.53% from $47,088 to $49,692 as part of the Operational Supervisor Pay Program which established new minimum salaries for specific front line supervisor positions to ensure that there was a salary differential of at least 10% between the supervisor's salary and that of the maximum salary for the union positions under that supervisor's management. (*Id*. at ¶ 12.) At the time of her demotion in September 2011, Plaintiff's annual salary was $56,112. (Dkt. No. 73-9, Ex. 1.)

Employee 1 was an external hire, hired in 2008.[7] There is no dispute that he had significant security and management experience before he joined United. Immediately prior to joining United, he held the position of Director of Security of Professional Security Consultants where he was assigned to the Westfield Valley Fair Shopping Center, and before that, he worked as a security manager supervising and managing large security teams. (Dkt. No. 73-13 at ¶ 3.) The salary range for the supervisor position at the time of his hire was $39,400-$75,800. (Dkt. No. 73-9 ¶ 13 & Ex. 5.) He was offered a salary of $58,008 which was the mid-point of the range based on United's compensation practice of targeting external hires toward the middle of the range. (*Id*. at ¶ 15; Dkt. No. 73-13 at ¶ 4.) As Plaintiff, he received merit pay increases in

---

[7] For privacy reasons, the other supervisors are identified as Employee 1, 2, and 3.

2009, 2010, and 2011.  (*Id.* at ¶¶ 11 & 15.)  As of September 2011, Employee 1's annual salary was $61,980.  (Dkt. No. 73-9, Ex. 4.)

Employee 2 began his career with United in 1989 as a mechanic.  The wage scale for mechanics at United is higher than the wage scale for security officers as they are governed by different collective bargaining agreements.  (Dkt. No. 73-9 at ¶¶ 16-17.)  In 1996, Employee 2 was promoted to Team Coordinator – Plant Equipment Maintenance at the Oakland Airport with an annual salary of $51,336.  (*Id.*)  In 2000, his position was retitled to Supervisor – Plant & Equipment Maintenance, and in 2003, he was furloughed from this position and offered the security supervisor position at the San Francisco maintenance facility.  (*Id.* & Dkt. No. 73-12 at ¶ 3.)  Employee 2's prior position as Supervisor – Plant & Equipment Maintenance was a higher grade level (G rather than F) than the security supervisor position.  In accepting the position as security supervisor, Employee 2 took a demotion and a 12.57% pay cut.  (Dkt. No. 73-9 at ¶ 18.)  Employee 2, as Plaintiff, received merit based raises during his tenure as security supervisor as well as the across-the-board increase in 2005 following United's restructuring and the across-the-board decreases following September 11 and United's bankruptcy.  (*Id.* at ¶ 19.)  As of September 2011, Employee 2's annual salary was $66,768.  (*Id.* at Ex. 6.)

Employee 3 replaced Plaintiff as the security supervisor in September 2011.  He was initially hired by United in December 2009 as a Manager – Distribution, a position that was two grade levels above the security supervisor position.  (Dkt. No. 73-9 at ¶ 20.)  As an external hire in 2009, his salary was set at the midpoint of the range for the manager position.  (*Id.*; Dkt. No. 73-6 at ¶ 24.)  Employee 3 held this position until 2011 when he was furloughed after his position went through the TAS Process.  (Dkt. No. 73-9 at ¶ 21.)   Shortly after his furlough, he became a Supervisor of Security and took a one-step demotion; however, because United's compensation practices changed during the TAS Process, Employee 3 did not take a pay cut with his demotion and instead retained his previous salary even though it fell outside the applicable maximum for the salary range for the supervisor position.  (*Id.* at ¶ 22.)  This is because during the TAS Process "one level demotions did not automatically reduce pay.  So [Employee 3's] pay was left the same. (Dkt. No. 73-3, Ex. 5 at 167:3-8.)  In September 2011, Employee 3 was rehired at his prior annual

1   salary of $80,004.[8]  (*Id.* at Ex. 8.)

2          Defendant contends that in light of this evidence legitimate business reasons support the

3   pay disparity between Plaintiff and Employees 1, 2, and 3.  Namely, Plaintiff's salary was set

4   based on Defendant's practice of setting the salary of Union employees moving into management

5   positions at the lower end of the salary range for the management position.  (Dkt. No. 73-11 ¶ 4.)

6   Employee 1 was an external hire with significant security and management experience and his

7   starting salary was higher than Plaintiff's because United's compensation practice was to target

8   external hires at the mid-point of the salary range in recognition of their skills and experience

9   because a decision to hire externally "generally follows a determination by the hiring manager

10  that the required talent cannot be identified internally."  (Dkt. No. 73-9 at ¶ 14.)   Employee 2

11  accepted the supervisor position after being furloughed from his higher grade and higher paying

12  supervisor position in another department, and took a pay cut in doing so.  (Dkt. No. 73-12 ¶ 3.)

13  Employee 3 took a demotion, but not a pay-cut when he became a security supervisor because the

14  compensation policy was revamped during the TAS Process such that one-level demotions did not

    require a pay-cut. (Dkt. No. 73-9 ¶ 22.)

15         Plaintiff insists that there is insufficient evidence that these are Defendant's actual policies

16  and that the Court must engage in fact finding or credibility determinations to accept Defendant's

17  representations of its compensation policies.  The Court disagrees.

18         First, Plaintiff contends that Defendant's failure to have a written policy undermines its

19  claim of a legitimate business reason for the pay disparities; however, Plaintiff has cited no case

20  which holds that an employer can only establish a legitimate nondiscriminatory basis for a pay

21  differential through evidence of a written policy.  In *Taylor v. White*, 321 F.3d 710, 717 (8th Cir.

22  2003), the court rejected the plaintiff's similar suggestion that the Army's informal and subjective

23  salary retention policy necessarily gave rise to an inference of discrimination.  In doing so, the

24  court concluded that if it was "permissible to rely upon a salary retention policy, the unwritten

25  nature of the policy or the presence of subjectivity or informality in the structure or administration

26  of the policy cannot, standing alone, support an inference of discrimination."  *Id.*

27

28  ────────────────
    [8] This was Employee 3's annual salary during his entire tenure with United from 2009-2014.
    (Dkt. No. 73-10, Ex. 8.)

United States District Court
Northern District of California

1    Here, that Defendant's compensation policies and practices are unwritten is likewise not

2    susceptible to an inference of discrimination where there is no evidence that it is simply a post-

3    hoc rationalization.  Contrary to Plaintiff's suggestion, numerous individuals testified to the

4    compensation practices outlined by Defendant's Rule 30(b)(6) designee Don Donohue.  Steven

5    Sulgit who supervised Plaintiff as a security officer attests that when Plaintiff was promoted to the

6    supervisor position, her salary was brought up to the minimum for the supervisor position

7    consistent with United's compensation policies which resulted in a nearly 52% raise.  (Dkt. No.

8    73-11 at ¶ 4.)  Another of Plaintiff's supervisors, Bernard Peterson, attests that he decided to hire

9    Employee 1, an external hire, because he was impressed with his background and experience, and

10   consistent with United's compensation practices the salary he offered him was at the midpoint of

11   the salary range for the supervisor position.  (Dkt. No. 73-13 at ¶ 4.)  Dennis Hughes, who was

12   responsible for managing the security department at the San Francisco maintenance facility at the

13   time Employee 2 was hired, attests that Employee 2 was furloughed and offered the security

14   supervisor position which resulted in a demotion and pay cut.  (Dkt. No. 73-12 ¶ 3.)  Thus, there

     is considerable corroboration for Defendant's compensation practices.[9]

15   Second, Plaintiff's attempt to create a genuine issue of material fact by attacking the

16   credibility of Defendant's witnesses without any supporting evidence is unavailing.  *See, e.g.*,

17   *Robinson v. Adams*, 847 F.2d 1315, 1317 (9th Cir. 1987) (holding that "[a]lthough the credibility

18   of the application screeners [who had submitted declarations] could be a triable issue, [plaintiff]

19   has produced no evidence that places their credibility in doubt."); *National Union Fire Insurance*

20   *Co. v. Argonaut Insurance Co.*, 701 F.2d 95, 97 (9th Cir. 1983) ("[N]either a desire to cross-

21   examine an affiant nor an unspecified hope of undermining his or her credibility suffices to avert

22   summary judgment.").   As discussed above, Mr. Donohue and the managers for the security

23   department at the time that Plaintiff, Employee 1, and Employee 2 each became supervisors all

24   submitted declarations attesting to United's compensation practice at the time of each individual's

25   promotion.  (Dkt. Nos. 73-9 ¶¶ 7-8, 14, 18; 73-11 ¶ 4; 73-12 ¶ 3, 73-13 ¶ 4.)  These declarations

26   are all consistent.  Plaintiff's reliance on *Rexroat v. Arizona Dep't of Educ.*, for the proposition

27

28   _____
     [9] Plaintiff's characterization of these compensation practices as being based on unidentified
     formulas is unpersuasive—Defendant has identified the formulas; namely, the salary bands, and
     attached documents reflecting the applicable bands.  (Dkt. No. 73-9, Exs. 3 & 5.)

United States District Court
Northern District of California

United States District Court
Northern District of California

that Defendant's declarants are insufficient is misplaced. There, the court relied on declarations of the plaintiff's supervisor, the head of human resources, and a Rule 30(b)(6) designee, although none of these individuals were the final decisionmaker regarding hiring. *Rexroat*, No. 11-1028, 2013 WL 85222, at *2, 6-7 (D. Ariz. Jan. 8, 2013), appeal dismissed (Jan. 13, 2014) ("Final hiring decisions within the ADE are made by the Associate Superintendent and reviewed by Human Resources for compliance with ADE policies."). Here, the declarants similarly attest that the salaries were set at the direction of human resources consistent with United's compensation practices. Absent any evidence that counters these declarations or provides the Court with a basis to question their reliability—which Plaintiff has not proffered—Plaintiff has not demonstrated that there is an issue of material fact with respect to what Defendant's compensation practices actually were.

The question then is not whether this practice, as outlined by Mr. Donohue and the managers of the security department (Sulgit, Peterson, and Hughes) is corroborated in a written policy, but rather whether it presents a legitimate neutral business reason for the pay differential. When conducting this inquiry, the Court may not substitute its judgment for that of the employer—"[t]he Equal Pay Act entrusts employers, not judges, with making the often uncertain decision of how to accomplish business objectives." *Kouba*, 691 F.2d at 876. Pay differences explained by disparate levels of relevant experience and qualifications constitute the sort of nondiscriminatory reason sufficient to rebut a prima facie case. *Stanley*, 178 F.3d at 1077. The court determines the reasonableness of the defendant's practices in light of its stated business reasons, and must find that the defendant's business reasons "do not reasonably explain its use of the factor before finding a violation of the Act." *Kouba*, 691 F.2d at 878.; *see also Rexroat*, 2013 WL 85222, at *6 (concluding that a compensation system based on earnings history presented a legitimate business reason); *E.E.O.C. v. Walgreen Co.*, No. 05-1400, 2007 WL 926914, at *8 (D. Ariz. Mar. 26, 2007) (defendant's explanation for the pay differential as the result of the fact that "each of [plaintiff's] male comparators were promoted to the position of function manager before [plaintiff], and as a result received pay that reflects the length of time they have spent as function managers" was a legitimate business reason); *Russell v. Placeware, Inc.*, No. 03-836, 2004 WL 2359971, at *11 (D. Or. Oct. 15, 2004) (concluding that the employer's "policy of allowing a

15

valuable employee who takes a lower-level position to maintain his or her prior salary" and "salary adjustments based on location" were legitimate business reasons).

At oral argument, Plaintiff only challenged the legitimacy of the business decision with respect to the initial setting of Plaintiff's salary. Defendant's proffered business reason is that union employees who become management employees are paid at the bottom end of the salary range for the management position as long as it represents at least a 10 percent pay increase. In Plaintiff's case, this process resulted in a pay increase of over 50 percent. The Court cannot conclude that Defendant's business reason "do[es] not reasonably explain its use of the factor." *Kouba*, 691 F.2d at 878. Although Defendant's salary bands provide for a range of salary within the security supervisor position, Defendant has offered a legitimate business reason for why Plaintiff's and her co-workers' salaries were placed where they were within the range that has nothing to do with gender.

Defendant has therefore demonstrated that the salary differentials between Plaintiff and Employees 1 and 2 are based on a "factor other than sex" under 29 U.S.C. § 206(d)(1)(iv); namely, a compensation policy that (1) sets employees' salaries at the bottom of the range when they move from a union to management position, (2) places the salary of external hires at the middle of a salary range for a particular position, and (3) requires employees who accept a demotion to accept a salary within the range for the new position even if that is less than their prior or current salary.[10] The burden thus shifts to Plaintiff to produce specific evidence sufficient to raise an inference that "the business reasons given by [defendant] do not reasonably explain [its] use of that factor." *Kouba*, 691 F.2d at 878.

Plaintiff's only argument in this regard is that United had a methodology for adjusting salary discrepancies between men and women or other protected classes which it should have applied to her. Plaintiff's only support for her argument is her own testimony which is

---

[10] Following the TAS Process this practice changed as Employee 3's employment history reflects; employees accepting a one-level demotion were allowed to maintain their prior salary and not take a pay cut. Defendant contends that the shift in the practice was based on the volume of position changes during the TAS Process—"[b]ecause of the sheer number of offer letters that were being processed at the time of the TAS Process, it was determined that this would be the most efficient and practical way of addressing a person's salary when he or she moved into a new position." (Dkt. No. 73-9 at ¶ 22.) Plaintiff has not offered any evidence to refute Defendant's explanation, and the Court thus likewise concludes that Defendant has demonstrated that it was predicated on a factor other than sex.

16

United States District Court
Northern District of California

inadmissible hearsay and wholly lacking in foundation as it is predicated on something she heard from another employee who allegedly had her salary adjusted after she complained.  (Dkt. No. 75-4, Ex. B-1 215:16-216:19.)  At oral argument, Plaintiff also argued for the first time that United has a policy of adjusting manager's salaries after 10 years to make them equal to their peers.  In support of this argument, Plaintiff cited to Exhibit A-3 to the Declaration of Spencer Smith which is 12-pages and includes numerous documents related to Plaintiff's April 2011 pay disparity complaint.  (Dkt. No. 76-2.)  Plaintiff was unable to cite a particular page, but based on the Court's review, Plaintiff must have been referring to the text on page two of a document entitled "Investigation Summary Report" under the heading "Interviews" which reads as follow:

- Within 10 years she should have been brought up to their scale.

  - This was our guideline, however with the pay decrease due to bankruptcy this was not achievable.

(Dkt. No. 76-2 at 2.)  It is unclear who made either of these statements as they appear under the heading "Interviews."  The document is thus inadmissible as lacking in foundation and it is unclear whether the person(s) who made the statements had any personal knowledge of the subject matter.[11]  Further, rather than supporting an inference that Defendant had such a policy, the statement supports an inference that no such policy was in place due to Defendant's 2004 bankruptcy.

Plaintiff cannot create a dispute of material fact without any evidence that actually creates a dispute.  *See F.T.C. v. Publ'g Clearing House, Inc*., 104 F.3d 1168, 1171 (9th Cir. 1997), as amended (Apr. 11, 1997) (noting that "conclusory, self-serving affidavits" and "statements in []briefs" which lack "detailed facts and any supporting evidence, [are] insufficient to create a genuine issue of material fact.").  Plaintiff has failed to present any evidence supporting a reasonable inference that Defendant's compensation policy is simply a pretext for discrimination; she has therefore failed to meet her "burden of demonstrating a material fact regarding pretext in

---

[11] The Declaration of Spencer Smith to which these documents are attached does nothing to lay a foundation or basis for the documents' admission—it simply states that the documents were produced during discovery.  However, Exhibit A-3 contains a series of different documents including multiple pages of typed and handwritten notes the author of which is not identified. (Dkt. No. 76-3 at p. 2-15, 9-12.)

order to survive summary judgment." *Stanley*, 178 F.3d at 1076.  The Court thus grants summary

judgment in Defendant's favor on the EPA claim.[12]

### B. Plaintiff's Demotion Claims

Plaintiff's retaliation claim, as well as her disability and age discrimination claims, hinge

on the same adverse action; namely, that she was demoted from her role as supervisor in

September 2011.  The Court thus examines whether Plaintiff has made a prima facie case with

respect to each claim, and if so, whether a reasonable trier of fact could find that Defendant's

explanation of her demotion is pretextual.

#### 1) Disability Discrimination

Title I of the ADA prohibits employment discrimination "against a qualified individual on

the basis of disability." 42 U.S.C. § 12112(a).  To state a prima facie claim under the ADA, a

plaintiff must demonstrate: (1) that she is a "qualified individual" within the meaning of the ADA;

(2) that she can perform the essential functions of her job; and, (3) that she suffered an adverse

employment action because of the disability.  *Kennedy v. Applause, Inc.*, 90 F.3d 1477, 1481 (9th

Cir. 1996).  Here, there is no dispute with respect to the first two prongs—Plaintiff is a qualified

individual who was able to perform the essential functions of her job as supervisor.  There is,

however, a significant dispute with respect to the third prong and whether there is any evidence

from which a reasonable trier of fact could infer that Plaintiff's demotion was related to her sleep

apnea.

Plaintiff has advanced two arguments in support of her contention that she was subject to

an adverse employment action based on her sleep apnea.  First, Plaintiff contends that

---

[12] Plaintiff's vague request for a continuance of the motion to allow discovery into Defendant's
salary-setting practices pursuant to Federal Rule of Civil Procedure 56(d) is denied.  "To prevail
under this Rule, parties opposing a motion for summary judgment must make (a) a timely
application which (b) specifically identifies (c) relevant information, (d) where there is some basis
for believing that the information sought actually exists." *Employers Teamsters Local Nos. 175 &
505 Pension Trust Fund v. Clorox Co.*, 353 F.3d 1125, 1129 (9th Cir. 2004) (internal citation and
quotation marks omitted).  Plaintiff has failed to demonstrate with particularity what discovery she
contends would be relevant and how such evidence would preclude summary judgment.  *Cal.
Union Ins. Co. v. Am. Diversified Sav. Bank*, 914 F.2d 1271, 1278 (9th Cir.1990) ("[t]he district
court does not abuse its discretion by denying further discovery if ... the movant fails to show how
the information sought would preclude summary judgment.")

United States District Court
Northern District of California

> an adverse inference should be drawn against United for instructing
> the Marvin-Nilson not to answer whether she received an email
> from World Headquarters corporate counsel Ms. Pulcanio
> concerning Ms. Cooper's disability (Smith Decl., Exh. "C" 43:14-
> 25).    At a minimum this presents information from which a
> reasonable juror could infer that Ms. Cooper's disability played a
> part in the decision to demote her.

(Dkt. No. 75 at 24 n. 11.)  Plaintiff offers no authority—and the Court is unaware of any—which would allow it to conclude that Plaintiff had established an adverse employment action based on disability through an adverse inference of this nature.  Even if the Court could so hold, Plaintiff's evidentiary cites do not bear out her argument—the portion of Ms. Marvin-Nilson's deposition cited above contains no such instruction or any reference to an email from World Headquarters or corporate counsel.  It is not the Court's task "to scour the record in search of a genuine issue of triable fact." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir.1996) (internal quotations omitted). Rather, a court is entitled to "rely on the nonmoving party to identify with reasonable particularity the evidence that precludes summary judgment." *Id.*; *see also Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001) ("The district court need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposing papers with adequate references so that it could conveniently be found").

Plaintiff's second argument—that she has "offered evidence sufficient for a reasonable juror to conclude that her acknowledged disability, along with her supervisor's statements that she would not accommodate that disability in the midst of the Talent Selection process were factors in the decision to demote Plaintiff" (Dkt. No. 75 at 24:15-18) —fares no better because Plaintiff has offered no such evidence.  It is undisputed that at the time Plaintiff raised the issue of her sleep apnea she was working the day shift and she had not been asked to work a shift outside daytime hours.  Ms. Marvin-Nilson informed Plaintiff via email that if her working hours changed they would address her disability as necessary.  (Dkt. No. 73-7, Ex. 10.)  Thus, there was neither a request to accommodate her sleep apnea nor a refusal to accommodate any such request.  Nor has Plaintiff offered any evidence that the supervisor position as it was reformulated through the TAS Process would require the supervisor to work at night.

At bottom, Plaintiff's assertion is that because Defendant was aware of her sleep apnea and

1    that, if her shift changed, she would need an accommodation, such knowledge is sufficient to meet

2    her prima facie burden of showing she was demoted because of her disability.  To accept

3    Plaintiff's unsupported argument, however, would eviscerate the third requirement of the prima

4    facie showing.  Plaintiff has therefore failed to demonstrate a prima facie case of discrimination

5    based on disability and summary judgment must be granted in Defendant's favor on this claim.

6           **2)  Age Discrimination**

7                 **a. Plaintiff has made out a prima facie case**

8           The ADEA makes it unlawful for an employer to discriminate "because of [an]

9    individual's age." 29 U.S.C. § 623(a)(1).  The prohibition is "limited to individuals who are at

10   least 40 years of age." 29 U.S.C. § 631(a).  A plaintiff establishes a prima facie case of

11   discrimination in violation of the ADEA by producing evidence that she was (1) at least forty

12   years old, (2) qualified for the position for which an application was submitted, (3) denied the

13   position, and (4) the position was given to a substantially younger person.  *Shelley v. Geren*, 666

14   F.3d 599, 608 (9th Cir. 2012); *see also Steckl v. Motorola, Inc.*, 703 F.2d 392, 393 (9th Cir. 1983)

15   (holding that the plaintiff established a prima facie case for age discrimination under the

16   *McDonnell Douglas* framework because he "was clearly within the protected class, had applied for

17   an available position for which he was qualified, and was denied a promotion which was given to

18   a younger person").

19          Defendant appears to concede, as it must, that Plaintiff has made out a prima face case of

20   discrimination under the ADEA.  Plaintiff is over 40 (she was born in 1950), she held the position

21   in question for nearly ten years prior to her demotion, she was demoted from her supervisor

22   position, and replaced by an individual ten years her junior.   Having established a "prima facie

23   case, the burden of production, but not persuasion, [] shifts to the employer to articulate some

24   legitimate, nondiscriminatory reason for the challenged actions." *Hawn v. Exec. Jet Mgmt., Inc.*,

25   615 F.3d 1151, 1155 (9th Cir. 2010) (internal citation and quotation marks omitted). "If defendant

26   meets this burden, plaintiffs must then raise a triable issue of material fact as to whether the

27   defendant's proffered reasons for their terminations are mere pretext for unlawful discrimination."

28   *Id.*

United States District Court
Northern District of California

**b. Legitimate Reason for Demotion**

Defendant has offered a legitimate non-discriminatory reason for its decision to demote Plaintiff; namely, that she performed poorly during the interview for the position.  It is undisputed that Plaintiff received the lowest interview score of the four candidates.  While Defendant's focus on interview performance as the primary selection criterion for the supervisor position may have been unfair, a trier of fact could not find that it was improperly discriminatory.  *See Lawler v. Montblanc*, No. 10–01131, 2011 WL 1466129, at *7 (N.D. Cal. Apr.15, 2011) (finding that the stated reason need not have been "wise or correct," but merely lawful and nondiscriminatory) (internal citation and quotation removed).  Accordingly, Defendant has met its burden of establishing that Plaintiff was demoted for a legitimate nondiscriminatory reason.

**c. Evidence of Pretext**

Thus, to survive summary judgment, Plaintiff must submit evidence sufficient to permit a reasonable jury to find that Defendant's explanation for her demotion is merely pretext for discrimination based on age.  "In response to the defendant's offer of nondiscriminatory reasons, the plaintiff must produce specific, substantial evidence of pretext.  In other words, the plaintiff must tender a genuine issue of material fact as to pretext in order to avoid summary judgment."  *Hsieh v. Stanford Univ.*, No. 09–05455, 2011 WL 1496337, at *3 (N.D. Cal. Apr. 20, 2011) (internal quotation marks and alterations omitted).

Plaintiff's pretext arguments are three-fold.  First, that Defendant's use of the TAS Process was unnecessary and not performed according to United's policies.  Second, that the individual who displaced her did not meet the minimum qualifications for the job.  Third, that Defendant has offered shifting rationales for her demotion which demonstrates pretext.  Each of these arguments fails.

**1) United's Policies and Procedures for the TAS Process**

First, Plaintiff contends that with respect to Plaintiff's position, United did not follow its own policies and procedures in determining whether the TAS Process would apply.  In support of this argument, Plaintiff purported to attach documents as Exhibit A-14 to the Declaration of Spencer Smith that reflect these policies and procedures; however, no such documents were

United States District Court
Northern District of California

submitted.[13]  Less than one week before the hearing, Plaintiff filed a supplemental declaration attaching the missing documents; namely, a presentation entitled "Briefing-Talent Selection Process, United Airlines, Inc. and Continental Airlines, Inc., October 4, 2010."  (Dkt. No. 79.)  Plaintiff contends that the documents were not submitted initially because it was unclear whether the documents had been designated as confidential.  (*Id.* ¶ 4.)  Despite Plaintiff's dilatoriness in supplementing the record with this evidence, the Court has considered the documents.  They do not, however, demonstrate that Defendant failed to follow the TAS Process with respect to the supervisor position.[14]

     At oral argument, Plaintiff argued that the TAS Process "requires the pool to be limited to the current incumbents" citing to this exhibit at the page bates-stamped 1834. (Dkt. No. 79-1 at p. 28).  Plaintiff's characterization is wrong—the document in fact states that "[g]enerally, jobs will be posted in an open process (not limited to natural incumbents) when these conditions are met...When a job is determined to require a broader candidate pool.  Manager makes decision to post based on following criteria...Job in new organization has changed requiring new or different qualifications/skills"  (*Id.*)  It is undisputed that the job description for the security supervisor position here was substantially rewritten to emphasize the management duties of the position and the overall role of the security supervisors in the department.  (Dkt. No. 73-6 at ¶ 7 "the new position went beyond supervision of the Security Officers and reflected a broader role and increased responsibilities;" *compare* Dkt. No. 73-6 Ex. 2 *with* Ex. 3.)  Under these circumstances, posting the position and not limiting it to incumbents was consistent with the TAS procedures.

     Plaintiff's related contention is that Defendant has failed to produce documents that explain its decision to implement the TAS Process for the supervisor position and that the Court should therefore infer that the decision was a pretext for discrimination.  In support of this argument, Plaintiff cites to documents produced in the *Bonillas* action which was also brought by

---

[13] The declaration indicated that the documents were to be filed under seal; however, no motion to seal was filed.

[14] The Court therefore denies as unnecessary Defendant's request to file separate objections to the late-submission.

United States District Court
Northern District of California

1    Plaintiff's counsel against United.  However, as discussed *supra*, the Court declines to take

2    judicial notice of these documents because Plaintiff failed to lay a foundation for the documents;

3    at a minimum, Plaintiff has not laid a foundation for these documents establishing what the TAS

4    process should look like.  To the extent that Plaintiff contends that Defendant failed to produce

5    relevant documents in response to discovery requests regarding the TAS Process, Plaintiff should

6    have raised the issue in a motion to compel, not for the first time in opposition to summary

7    judgment.  In any event, a reasonable fact finder could not infer that the absence of documents

8    regarding the decision to implement the TAS Process demonstrates discriminatory animus when

9    Plaintiff has failed to produce evidence that Defendant had a policy or procedure with respect to

10   implementation of the TAS Process that was not followed here.

11       The evidence in the record indicates that following the merger with Continental all United

12   management and administrative positions went through a talent selection process whereby some

13   positions were largely unchanged, some positions were modified, and others were eliminated.

14   (Dkt. No. 73-6 at Ex. 1.)  Even for those positions that were largely unchanged, the hiring

15   manager had the option to review the needs of the position and open it up to other qualified

16   applicants as necessary.  (*Id*.)  As the Senior Manager – Base Maintenance Support Services for

17   the maintenance facility at the San Francisco Airport, Ms. Marvin-Nilson was responsible for the

18   decision to implement the TAS Process for the security supervisor position.  She testified that "in

19   the talent selection process, all positions were evaluated throughout the company, starting at the

20   CEO on down.  When it got to her position, we – I was required to rewrite a job description, which

21   expanded the roles and responsibilities of a security supervisor.  And that point, we posted the

22   position to evaluate the best available talent at the company."  (Dkt. No. 75-4, Ex. C at 69:15-21.)

23   As part of this process, "[e]very job in the company had—every job description was rewritten and

24   approved" by a "committee in Chicago."  (*Id*. at 70:6-11.)  Ms. Marvin-Nilson met with her boss,

25   Kathy Cassley, who approved the revised job description before it was sent off the committee.

26   (*Id*. at 71:2-8.)  Once approved, the position was posted on the company intranet.  (*Id*. at 71:15-

27   16.)

28       Plaintiff suggests that a trier of fact can infer discriminatory animus from Ms. Marvin-

23

1    Nilson's inability to recall details such as how she was informed of the need to rewrite the job

2    description, how long it took her to rewrite the job description, and how long it took the committee

3    to approve the job description.  Although deviation from established policy or practice may be

4    evidence of pretext, Plaintiff has failed to offer any evidence of the policies from which Ms.

5    Marvin-Nilson supposedly deviated.  *See Diaz v. Eagle Produce, Ltd.*, 521 F.3d 1201, 1214 (9th

6    Cir. 2008).

7            Finally, Plaintiff misrepresents the evidence that actually does exist in the record in this

8    regard.  Plaintiff maintains that "the only way Plaintiff knew that she had to apply for a position"

9    was "when a representative from Houston called Plaintiff while she was on an approved leave [to]

10   inform[] her that she had one day to complete the application."  (Dkt. No. 75 at 26:19-23.)

11   Plaintiff testified, however, that Ms. Marvin-Nilson informed all three supervisors of the Talent

12   Selection Process at a group meeting in August.  (Dkt. No. 73-2, Ex. 1 at 38:23-40:17.)

13   Moreover, Ms. Marvin-Nilson was not the first supervisor to contemplate implementation of the

14   TAS Process for the Security Supervisor position.  Plaintiff's prior supervisor, Bernard Peterson,

15   told Plaintiff that "he didn't know if he was going to do a talent selection process or not for our

16   department…And so he had not made a decision to do this talent selection process."[15] (Dkt. No.

17   75-4, Ex. B-2 at 357:6-12.)

18           Plaintiff has thus failed to offer evidence from which a reasonable juror could infer that

19   Defendant departed from its own policies and procedures with respect to the TAS Process when it

20   demoted Plaintiff.

21                          **2) Qualifications of the Other Applicant**

22           Next, Plaintiff argues that pretext is demonstrated by Defendant permitting Mr. Faultner to

23   apply for the position despite not meeting the minimum qualifications; that is, possession of a

24   valid California Bureau of Security and Investigative Services (BSIS) guard license and security

25

26

27   _____
     [15] Plaintiff again mischaracterizes the record on this point citing to the same testimony but stating
28   that Mr. Peterson said he did not believe it would be necessary; rather, Mr. Peterson said that he
     was not sure.

                                                        24

United States District Court
Northern District of California

1    experience. [16]

2            In support of her argument that Mr. Faultner did not possess a valid guard license, Plaintiff

3    relies on print-outs from the website for the California Department of Consumer Affairs Bureau of

4    Security and Investigative Services; however, the Court *supra* declined to grant judicial notice of

5    these documents to the extent Plaintiff seeks to introduce the documents for the purpose of

6    establishing that Mr. Faultner did not have his guard license at the time he applied.  However,

7    even if the Court were to rely on the document to establish when Mr. Faultner's current license

8    was issued, it merely shows that it was issued on August 25, 2011, which is indisputably before

9    the interviews were conducted for the supervisor position and prior to any offer of the position.

10   There is no evidence that Defendant made some sort of exception for Mr. Faultner; rather, Ms.

11   Marvin-Nilson was advised by the recruiter that Mr. Faultner was in the process of *renewing* his

12   guard license (which is what he represented to Ms. Marvin-Nilson) which made him eligible for

13   the position.  (Dkt. No. 75-4, Ex. C at 47:13-48:10; Dkt. No. 73-7, Ex. 7 at 103.)

14           Plaintiff's argument that Mr. Faultner lacked the security experience required for the

15   position fares no better.  Law enforcement experience was not required for the position under the

16   revised job description (nor is there any evidence that it was previously required).  (*Compare* Dkt.

17   No. 73-7 ¶ 7 & Ex. 3 *with id*. at Ex. 2.)  Further, Mr. Faultner testified that he did have security

18   experience.  (Dkt. No. 73-3, Ex. 2 at 31:19-23 ("Q: At the time you applied for the security

19   supervisor position, about how many years of experience would you say you had with security? A:

20   I would say roughly, in my estimation, 15 to 20 years.")

21           Plaintiff could establish that Defendant's articulated reasons were pretextual if her

22   qualifications were "clearly superior" to the qualifications of the selected applicant. S*ee Road v.*

23   *Fairbanks N. Star Borough Sch. Dist*., 323 F.3d 1185, 1194 (9th Cir. 2003).  However, she has not

24   done so.  Plaintiff has thus failed to offer evidence from which a reasonable juror could infer that

25

26   _____

27   [16] Although Plaintiff argues that "Defendant has failed to produce the contemporaneous records
     required by Talent Selection to permit non-incumbents to apply for the Security Supervisor
     position," as discussed *supra*, Plaintiff has not offered admissible evidence that any such records

28   are required.  (Dkt. No. 75 at 28:6-8.)

United States District Court
Northern District of California

1    Mr. Faultner lacked the requisite qualifications for the position.

2                    **3) Defendant's Explanation for Plaintiff's Demotion**

3              Finally, Plaintiff contends that Defendant's reasons for her demotion changed over time.

4    At oral argument, Plaintiff's counsel repeatedly argued that Plaintiff and her fellow supervisors

5    were told that they would have to reapply for their positions due to a reduction in force, and in

6    fact, represented that "[w]hen [Plaintiff] filed this lawsuit, she was under the impression that [her

7    demotion] was because of a reduction in force."  (Dkt. No. 82 a 22:4-6.)  This statement is

8    contradicted by the record.   At her deposition, Plaintiff testified as follows:

9              Q. Okay.  Now, you understood, that as part of the talent selection
              process, that there were going to be – there were three security
10             supervisor positions before the talent selection process, correct?

11             A. Yes.

12             Q. And you knew that there were going to be three positions after
              the talent selection process, correct?
13
              A. Yes.
14
     (Dkt. No. 73-2, Ex. 1 at 33:7-14.)  There was thus no misunderstanding on Plaintiff's part as to
15
     whether her position was being eliminated because of a reduction in force—Plaintiff knew no
16
     positions were being eliminated.
17
              Plaintiff's related argument relies upon the letter she received informing her of her
18
     demotion being captioned "Reduction in Force Lay Off Notice."  According to Ms. Marvin-
19
     Nilson, everyone who was not selected to retain his or her position following the TAS Process
20
     received the same form letter.  (Dkt. No. 73-6 ¶ 18.)   There is no dispute that there was not a
21
     reduction in force with respect to the supervisor position and Plaintiff admitted that she knew that
22
     there was not going to be a reduction in force.  Thus, the most that could be inferred is that the
23
     letter was sent in error, or more likely, that Defendant provided a confusing explanation to
24
     individuals who were not selected to retain their positions through the TAS Process.  This is not
25
     the sort of "substantial changes over time in the employer's proffered reason for its employment
26
     decision [which] support a finding of pretext." *Sanchez v. Corrections Corp. of America*, No. 06-
27
     0152 , 2007 WL 1390675, *12 (E.D. Cal. May 9, 2007); *see also Washington v. Garrett*, 10 F.3d
28

United States District Court
Northern District of California

1    1421, 1434 (9th Cir.1993) ("*fundamentally different justifications* for an employer's action would

2    give rise to a genuine issue of fact with respect to pretext since they suggest the possibility that

3    neither of the official reasons was the true reason") (emphasis added).

4         Defendant has consistently maintained that Plaintiff was not selected to maintain her

5    position because she performed poorly during her interview.  Plaintiff has not contested her

6    interview performance, nor has Plaintiff suggested that there was something problematic with the

7    substance or format of the interview.  Plaintiff's only complaint with respect to the interview

8    seems to be that she was not asked any questions that pertained specifically to the Security

9    Department.  (Dkt. No. 75-1 at ¶ 26.)   William Knight, who submitted a declaration in support of

10   Plaintiff's opposition brief, attests that it was a "structured interview and I was asked situational

11   questions about how I handle employees.  I do not recall being asked anything specifically related

12   to security."  (Dkt. No. 75-2 at ¶ 7.)  There is nothing from this testimony which supports a

13   reasonable inference that the interview was rigged or set up in some way to disfavor Plaintiff.  In

14   fact, Adam Calmis, the manager who conducted the interviews along with Ms. Marvin-Nilson,

15   attests that the interviews were conducted using a standard interview guide, and that each

16   candidate was asked the same pre-selected questions.  (Dkt. No. 73-8 at ¶ 4.)  A copy of Mr.

17   Calmis's notes from Plaintiff's interview show each question that was asked of Plaintiff and bears

18   Mr. Calmis's handwritten notes regarding the interview—the questions are all standard interview

19   fare and range from "[a]ccomplishing team goals often requires activities and tasks beyond formal

20   team meetings.  Tell me about something you've done outside of formal meetings that helped a

21   team accomplish its objectives" to "[g]ive me an example in the workplace where someone did not

22   treat you with dignity and respect.  What was your approach to the situation?"  (Dkt. No. 73-8, Ex.

23   1 at pp. 12, 16.)  According to Mr. Calmis, Plaintiff's answers to the interview questions "were

24   very short and clipped.  As a supervisor, I think it is important to exhibit and show ownership over

25   issues you are tasked with handling, and in my view, Ms. Cooper did not display any such sense of

26   ownership.  Based on the interview, I did not feel that Ms. Cooper had the leadership or

27   management skills that we were looking for in a Supervisor."  (Dkt. No. 73-8 at ¶ 6.)  There is

28   thus no evidence from which a factfinder could infer that Plaintiff's low interview score was a

United States District Court
Northern District of California

27

1    pretext for discrimination.

2        In sum, Plaintiff has failed to offer any evidence from which a reasonable juror could infer

3    that the decision not to retain her in the supervisor position had anything to with her age.  "The

4    focus of a pretext inquiry is whether the employer's stated reason was honest, not whether it was

5    accurate, wise, or well-considered. We do not sit as a superpersonnel department that reexamines

6    an entity's business decision and reviews the propriety of the decision." *Stewart v. Henderson*, 207

7    F.3d 374, 378 (7th Cir. 2000) (citations omitted).  The Court therefore grants summary judgment

8    in Defendant's favor on Plaintiff's age discrimination claim.

9        **3)  Retaliation**

10       The relevant standard for a retaliation claim under Title VII is that the plaintiff (1) engaged

11   in a protected activity, (2) that her employer subjected her to an adverse employment action, and

12   (3) that a causal link exists between the protected activity and the adverse action.  *Freitag v. Ayers*,

13   468 F.3d 528, 541 (9th Cir. 2006).  The plaintiff has the burden to present evidence that

14   establishes a link between her protected activity and any adverse employment action.  *Coons v.*

15   *Sec'y of the U.S. Dep't of Treasury*, 383 F.3d 879, 887 (9th Cir. 2003).  As with the inquiry on

16   Plaintiff's age discrimination claim, "[o]nce the plaintiff establishes a prima facie case, the

17   employer has the burden to present legitimate reasons for the adverse employment action." *Id.* "If

18   the employer carries this burden, and plaintiff demonstrates a genuine issue of material fact as to

19   whether the reason advanced by the employer was a pretext, then the retaliation case proceeds

20   beyond the summary judgment stage." *Id.*

21       **a.  Protected Activity**

22       Plaintiff initially alleged that she engaged in three categories of protected activities: (1)

23   filing a complaint regarding the pay disparity between herself and her fellow supervisors, Mr.

24   Knight and Mr. Martin Del Campo; (2) initiating the reasonable accommodation process in the

25   spring of 2011;[17] and (3) making other complaints regarding age and race discrimination from

26

27   [17] Plaintiff cites to Exhibit A-17 to the Declaration of Spencer Smith in support of this, but the
     exhibit makes no reference to the type of disability for which Plaintiff sought an accommodation.
28   (Dkt. No. 76-4, Ex. A-17.)  Further, two pages of the three-page exhibit post-date Plaintiff's
     September 2011 demotion.

United States District Court
Northern District of California

2008-2011.[18]  However, at oral argument, Plaintiff's counsel clarified that the only protected activity alleged was the complaint about the pay disparity.  (Dkt. No. 82 at 21:14-18.)  It is undisputed that Plaintiff's complaint regarding her pay disparity constitutes a protected activity.

### b.  Adverse Action

Plaintiff alleges the following adverse actions: "removing her from a security supervisor position, not rehiring during Talent selection Process, not rehiring her after William Knight resigned, and [not] rehiring her when Russ Faultner resigned."  (Dkt. No. 75 at 19:11-14.)  Of these, only the decision to demote her and remove her from her supervisor position in September 2011 was pled in the FAC.  The other alleged adverse actions were neither pled in the FAC (which was filed less than four months ago so there can be no claim that Plaintiff was not aware of the basis for the allegations at the time) nor were they otherwise raised in discovery.[19]  They are therefore not properly before the Court.  *See Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1080 (9th Cir. 2008) ("where ... the complaint does not include the necessary factual allegations ... raising such a claim in a summary judgment motion is insufficient to present the claim to the district court"); *Pickern v. Pier 1 Imports (U.S.), Inc.*, 457 F.3d 963, 968 (9th Cir. 2006) (holding that the district court "did not err by holding that [plaintiff] failed to provide the Appellees with adequate notice of these new allegations.  Federal Rule of Civil Procedure 8(a)(2) requires that the allegations in the complaint give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.").  Plaintiff's case citations are inapposite as they address whether a plaintiff can seek redress for matters that flow from the allegations in her administrative charge and not with whether a plaintiff can identify new adverse actions in opposition to summary

---

[18] These are identified as: "(1) from 2008-11, she made several complaints to Bernard Petersen, Sheila Asfaha, and Sandee Singer regarding being stripped of duties and feeling ostracized because of, inter alia, her age; (2) in October 2009, she complained to Ally Zauner regarding, inter alia, workplace discrimination; (3) in July 2010, she investigated race discrimination complaints against Del Campo; and (4) in April 2011, she complained to Anhvu Ly regarding, inter alia, regarding pay inequities, which she also raised with UAL Compliance Manager Wayne Slaughter ("Slaughter")."  (Dkt. No. 75 at 18:7-14.)

[19] In response to Interrogatory No. 5 which asked Plaintiff to describe any adverse actions, Plaintiff's amended response states that "she was demoted as set forth in the complaint," and does not identify the decision not to rehire her after Mr. Knight and Mr. Faultner resigned. (Dkt. No. 73-4, Ex. 7 at 29.)

United States District Court
Northern District of California

judgment. *See Oubichon v. N. Am. Rockwell Corp.*, 482 F.2d 569, 571 (9th Cir. 1973) (holding that a judicial *complaint* can include any discrimination reasonably related to the allegations of the EEOC charge); *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 465 (5th Cir. 1970) (concluding that "the specific words of the charge of discrimination need not presage with literary exactitude the judicial pleadings which may follow.").

### c.  Causal Link

The Court thus must determine whether Plaintiff has raised a triable issue of fact as to whether there is a causal link between Plaintiff's demotion in September 2011 and her protected activity.  Courts may infer the requisite causal link from "the proximity in time between the protected activity and the adverse action."  *See Dawson v. Entek Int'l*, 630 F.3d 928, 936 (9th Cir. 2011).  Plaintiff's complaint regarding her pay disparity was closed on May 18, 2011.  (Dkt. No. 73-15, Ex. 1.)  Although it is unclear when Ms. Marvin-Nilson made the decision to implement the TAS Process for the security supervisor position, it had to have occurred sometime between April 2011 when she took over managing the department and mid-August when Ms. Marvin-Nilson told Plaintiff and the other two supervisors that they were going to have to re-apply for their positions.  (Dkt. No. 73-6 at ¶ 9.)  Ms. Marvin-Nilson's declaration indicates that Plaintiff mentioned the pay disparity complaint to her sometime in late June.  (Dkt. No. 73-6 at ¶ 22.)

A several-month gap in time does not provide the requisite causal link.  *See Clark County School Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (stating that "[t]he cases that accept mere temporal proximity ... hold that the temporal proximity must be very close" and citing cases where a gap of three to four months was found insufficient).  Thus, while "causation can be inferred from timing alone," such an inference can only be made if the adverse action occurred "on the heels" of protected activity.  *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir. 2002).  Here, the gap in time could have been as great as four months or as little as one.  Drawing all inferences in Plaintiff's favor, as the Court must at this stage, the Court concludes that causation could be inferred from the temporal proximity between Plaintiff advising Ms. Marvin-Nilson of her pay complaints and Ms. Marvin-Nilson's decision shortly thereafter to put the supervisor

United States District Court
Northern District of California

United States District Court
Northern District of California

1  position through the TAS process and Plaintiff's subsequent demotion.[20]  Plaintiff has thus stated a

2  prima facie claim for retaliation under Title VII.

3  **d.  Legitimate Reason for Demotion**

4  Defendant has, however, articulated a legitimate, non-discriminatory reason for its actions;

5  that is, Plaintiff's poor performance during the interview.  Accordingly, for the same reason

6  Defendant has satisfied its burden to demonstrate that Plaintiff was demoted for a legitimate

7  nondiscriminatory reason with respect to Plaintiff's age discrimination claim, Defendant has

8  satisfied its burden with respect to Plaintiff's retaliation claim.

9  **e.  Pretext**

10  The burden then shifts back to Plaintiff to demonstrate that Defendant's articulated reason

11  was pretext for discrimination.  Temporal proximity is not enough to satisfy Plaintiff's ultimate

12  burden; the evidence shows that even Plaintiff herself did not believe that her demotion was based

13  on her pay disparity complaint.  Instead, Plaintiff testified that she believed she was not selected

14  for promotion because of conflicts between herself and Ms. Marvin-Nilson:

15

16

17  [20] The same cannot be said with respect to Plaintiff's other—now abandoned—claims of protected activity; namely, her request for a reasonable accommodation in April 2011 and her complaints

18  about race and age discrimination beginning in 2008.  With respect to Plaintiff's request for an accommodation for her sleep apnea, although Plaintiff's meeting with Ms. Marvin-Nilson took

19  place two months prior to her demotion, there is nothing from which one could infer that Plaintiff's request for an accommodation factored into the decision to demote her at all.  Ms.

20  Marvin-Nilson told Plaintiff that any request for an accommodation was premature as Plaintiff worked the daytime shift and there is no evidence that the fact that Plaintiff asked for a then

21  unnecessary accommodation had anything to do with the decision not to retain her in the supervisor position; accordingly, there is no causation.  Similarly, Plaintiff's prior complaints of

22  age and race all pre-date Ms. Marvin-Nilson's time in the Security Department and there is no evidence she was aware of Plaintiff's complaints.  While an inference of causation may arise

23  based on timing or a pattern of conduct, such an inference can arise only where the evidence, construed in favor of the plaintiff, shows that "the employer was aware that the plaintiff had

24  engaged in the protected activity."  *Cohen v. Fred Meyer, Inc.*, 686 F.2d 793, 796 (9th Cir. 1982). Thus, in *Cohen*, the court held in a Title VII retaliation case that there was no causation where the

25  evidence established that the supervisor who made the decision to demote the plaintiff was unaware that the plaintiff had filed an EEOC complaint and there was "no evidence that any

26  company official or employee who had knowledge of [the plaintiff's] complaint had any part in the policy decision."  *Id*; *see also Raad v. Fairbanks North Star Borough School Dist.*, 323 F.3d 1185,

27  1197 (9th Cir. 2003) (granting employer's motion for summary judgment because plaintiff "fail[ed] to point to any evidence in the record supporting her assertion that Layral and Thibodeau,

28  the particular principals who made the allegedly retaliatory hiring decisions, in fact were aware of her complaints").

A.     I believe that it had to do with several things. I don't think the manager, at that time, was too pleased with me. And I do believe that if she could get rid of me, that was her main source, which she did. I think that the fact that I had some disability issues probably played a part in that, because I had spoken to her about my disabilities. I believe that, you know, probably had a lot to do with it. And I think the fact that I actually spoke back to her when I thought that things were not done properly or things were said to me that were out of contents, the way that, you know, she would talk to me, I think it may have been some retaliation there, because like, you know, we had some issues, and the issues that we had were not the same as the ones that she had with the men. She, you know, talked to me differently, different tone, different body movement, attitude, when it came around to me opposed to talking to the guys. And I just think that, you know, she basically wanted me out of the picture.

Q.     Okay. So what I'm interested in, what, in your own mind, you believe were the reasons that you were not selected. And have you told me everything?

MR. PATTEN: Go ahead.

THE WITNESS: Let's see. Like I say, I think it was the fact that we had had problems. I know that she didn't like the fact that I told her -- you know, like she would talk to me as though I was stupid, ignorant, idiot, or something of that nature. And I don't think she liked the fact that I informed her that I was none of the above, you know, that I was educated, had degrees, and, you know, I refused to allow her to talk to me in any kind of manner. So I think that was one of the main reasons that she wanted me out, because I think she felt that I might have been a challenge to her to a certain degree. And then, like I say, I don't think they wanted to really accommodate my needs in regards to my disabilities.

(Dkt. No. 75-4 at 276:24-278:11).  Plaintiff's subjective belief that Ms. Marvin-Nilson did not like her and was trying to get rid of her is insufficient to show pretext.  *See Cornwell v. Electra Cent. Credit Union*, 439 F.3d 1018, 1028 n.6 (9th Cir. 2006) (a plaintiff's subjective belief that her termination was unnecessary or unwarranted is not sufficient to create a genuine issue of material fact); *see also Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1290 (9th Cir. 2000)("favoritism of managers is not age discrimination.").

Further, as explained *supra*, Plaintiff has not offered any evidence from which a reasonable fact finder could infer that her low interview score was a pretext for discrimination.  Plaintiff does not contend that her interview differed in any way from that of the other three individuals applying for the supervisor position nor has Plaintiff disputed Defendant's evidence regarding the interviews—all the applicants were asked the same standard questions and received numerical

32

scores for their responses which were tallied at the end of the interview.   According to both Ms. Marvin-Nilson and Mr. Calmis, Plaintiff performed poorly during the interview and thus received the lowest score: a total of 13 out of 45 possible points.  Thus, for the same reasons Plaintiff has failed to do so with respect to her age discrimination claim, Plaintiff has failed to offer evidence from which a reasonable juror could conclude that Defendant's proffered explanation was pretext for unlawful retaliation.  The Court therefore grants summary judgment in Defendant's favor on Plaintiff's retaliation claim.

**CONCLUSION**

For the reasons set forth above, the Court GRANTS Defendant's Motion for Summary Judgment.

This Order disposes of Docket No. 73.

**IT IS SO ORDERED**.

Dated:  March 10, 2015

_____
JACQUELINE SCOTT CORLEY
United States Magistrate Judge

United States District Court
Northern District of California

33